In The

# United States Court Of Appeals
# For The Fourth Circuit

**LATOYA K. BENTON,**
**Administrator of the Estate of Xzavier D. Hill, Deceased,**

*Plaintiff – Appellant,*

v.

**SETH W. LAYTON, Individually and in his official capacity as a State Trooper for the Virginia State Police;**
**BENJAMIN I. BONE, Individually and in his official capacity as a State Trooper for the Virginia State Police,**

*Defendants – Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EATERN DISTRICT OF VIRGINIA
AT RICHMOND

————————

## BRIEF OF APPELLANT

————————

Zachary W. Ezor
TIN FULTON WALKER & OWEN, PLLC
115 East Main Street
Durham, NC 27701
(404) 791-8243

*Counsel for Appellant*

# TABLE OF CONTENTS

Page:

TABLE OF AUTHORITIES ............................................................... iii

JURISDICTIONAL STATEMENT .......................................................... 1

ISSUE PRESENTED ................................................................... 2

INTRODUCTION ..................................................................... 3

STATEMENT OF THE CASE ............................................................. 4

    A.    Hill gets his car stuck in a highway median .......................... 4

    B.    Troopers move on Hill's vehicle with guns drawn and shout a bevy of commands ..................................... 5

    C.    Troopers shoot and kill Hill ......................................... 7

    D.    The district court holds that qualified immunity shields the Troopers ............................................. 8

SUMMARY OF THE ARGUMENT ......................................................... 10

ARGUMENT ........................................................................ 11

    Standard of Review ...................................................... 11

    Discussion of Law ....................................................... 12

    I.    Hill's killing violated the Fourth Amendment ..................... 13

        The severity of the crime at issue ...................................... 14

        Whether Hill posed an immediate threat ............................ 16

        Whether Hill was attempting to flee ................................. 22

II.    The Troopers are not entitled to qualified immunity ........... 23

III.   The district court wrongly dismissed the state-law
       claims .................................................................................. 26

CONCLUSION ......................................................................................... 27

STATEMENT REGARDING ORAL ARGUMENT ................................ 27

CERTIFICATE OF COMPLIANCE ....................................................... 28

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Anderson v. Russell,*
    247 F.3d 125 (4th Cir. 2001) ................................................ *passim*

*City of Tahlequah v. Bond,*
    ___U.S.___, 142 S. Ct. 9 (2021) ............................................... 23, 24

*Cooper v. Sheehan,*
    735 F.3d 153 (4th Cir. 2013) ....................................... 16, 19, 24, 25

*Elliot v. Leavitt,*
    99 F.3d 640 (4th Cir. 1996) ....................................... 19, 20, 25, 26

*Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst,*
    810 F.3d 892 (4th Cir. 2016) ........................................................ 15

*Estate of Jones v. City of Martinsburg,*
    961 F.3d 661 (4th Cir. 2020) ........................................................ 24

*Franklin v. City of Charlotte,*
    64 F.4th 519 (4th Cir. 2023) ................................................ *passim*

*Graham v. Connor,*
    490 U.S. 386 (1989) .............................................................. *passim*

*Henry v. Purnell,*
    652 F.3d 524 (4th Cir. 2011) ........................................................ 11

*Hensley ex rel. North Carolina v. Price,*
    876 F.3d 573 (4th Cir. 2017) ................................................ *passim*

*Hupp v. Cook,*
    931 F.3d 307 (4th Cir. 2019) ........................................................ 12

*Jones v. Buchanan*,
325 F.3d 520 (2003) ...................................................................... 14

*Knibbs v. Momphard*,
30 F.4th 200 (4th Cir. 2022).................................................... 22, 25

*Parker v. Gerrish*,
547 F.3d 1 (1st Cir. 2008)............................................................ 15

*Pearson v. Callahan*,
555 U.S. 223 (2009) ...................................................................... 12

*Rowland v. Perry*,
41 F.3d 167 (4th Cir. 1994) ........................................................ 26

*Slatterly v. Rizzo*,
939 F.2d 213 (4th Cir. 1991) ..................................... 19, 20, 22, 25

*Smith v. Ray*,
781 F.3d 95 (4th Cir. 2015) ............................................. 15, 22, 24

*Thompson v. Virginia*,
878 F.3d 89 (4th Cir 2017) .......................................................... 26

*Vathekan v. Prince George's Cnty.*,
154 F.3d 173 (4th Cir. 1998) ...................................................... 13

*White v. Pauly*,
58 U.S. 73 (2017) .......................................................................... 25

*Williams v. Strickland*,
917 F.3d 763 (4th Cir. 2019) ...................................................... 24

**Statutes:**

28 U.S.C. § 1291 ................................................................................ 1

28 U.S.C. § 1331 ................................................................................ 1

28 U.S.C. § 1367 ................................................................................ 1

42 U.S.C. § 1983 ........................................................... 9

Va. Code § 46.2-852 ..................................................... 14

Va. Code § 46.2-862 ..................................................... 14

Va. Code § 46.2-868(A) ................................................ 14

Va. Code § 46.5-817(A) ................................................ 15

Va. Code § 46.5-817(B) ................................................ 15

**Constitutional Provisions:**

U.S. Const. amend. IV .................................................. *passim*

**Rules:**

Fed. R. Civ. P. 56(a) .................................................... 11

# JURISDICTIONAL STATEMENT

The district court had federal-question jurisdiction over Benton's constitutional claims, and supplemental jurisdiction over her state-law claims.  28 U.S.C. §§ 1331, 1367.

On May 30, 2023, the district court granted summary judgment in favor of the Troopers on all claims.  JA918-919.  Benton filed a notice of appeal on June 22, 2023.  JA920.  This Court has jurisdiction over a final judgment of the district court.  28 U.S.C. § 1291.

## ISSUE PRESENTED

Two Virginia State Troopers killed Xzavier Hill. Hill got his car stuck in a highway median after the Troopers caught him speeding. The Troopers approached his immobilized vehicle with their guns drawn, shouted a bevy of commands, then shot him. Although the Troopers assert that Hill pointed a gun at them, that fact is in dispute.

Did the district court err in granting summary judgment to the Troopers on the basis of qualified immunity?

## INTRODUCTION

Xzavier Hill was eighteen years old when he was killed by the Virginia State Police. His mother, LaToya Benton, filed this suit alleging that the lethal force used against Hill was excessive.

The Troopers who shot Hill—Seth Layton and Benjamin Bone—claim they are entitled to qualified immunity, and the district court agreed.

However, taking the facts in the light most favorable to Benton, a reasonable jury could find that the Troopers violated Hill's Fourth Amendment rights.

After catching Hill speeding, the Troopers followed him down the highway. When Hill attempted a U-turn, his car slid down an embankment and became lodged in the median. The Troopers moved on Hill with their guns drawn, and, in the span of just thirty seconds shouted sixteen separate commands. Hill tried to comply, but did so imperfectly.

The Troopers fired on Hill, they say, after he pointed a gun at them. But as the district court rightly noted, whether Hill ever held a gun or pointed it at the Troopers is in dispute.

Moreover, the unlawfulness of Hill's killing was clearly established at the time.  This Court has repeatedly held that the mere possession of a firearm does not justify the use of deadly force—even when the gun is held by the suspect, and clearly visible—unless there is reason to believe that an officer's safety is threatened.

Taking all facts and inferences in Benton's favor (as the Court must at this stage), the Troopers fired on a confused, nonthreatening teenager doing his best to obey their commands.  Although a jury may ultimately disagree, the district court was wrong to grant summary judgment.

## STATEMENT OF THE CASE

### A.    Hill gets his car stuck in a highway median.

In the early morning of January 9, 2021, Troopers Bone and Layton were parked in a crossover on Interstate 64.  Hill drove by, going well over the speed limit.  (Dashcam at 1:45)[1]

---

[1] This incident was captured by the dashcam mounted in the Troopers' vehicle.  The video is available to the Court in the digital media volume of the Joint Appendix.

The Troopers pulled onto the highway and caught up to Hill. They followed him without running their lights or sirens. (2:34–3:36) After more than a minute, Bone transmitted Hill's plate number to dispatch. (3:37) Layton then turned on the emergency lights, and Hill accelerated further. (3:38–4:18)

Hill eventually slowed and pulled onto the righthand shoulder. (4:19–4:33) He then made a U-turn across the highway, reached the lefthand shoulder, and slid down an embankment. (4:33–4:39) His car got stuck in the median, parallel to the road and facing traffic. (4:40) He turned the wheel and spun his tires, but his car was immobilized. (4:51)

### B. Troopers move on Hill's vehicle with guns drawn and shout a bevy of commands.

The Troopers pulled their cruiser across both lanes of the highway and parked perpendicular to Hill's car. (4:41) Their headlights shown directly into Hill's window. (*Id.*) Within seconds, both Troopers exited their vehicle. (4:50) They pointed their guns directly at Hill, paced towards him, and shouted a barrage of commands:

**Bone**:     "GET OUT OF THE CAR NOW!"
              "GET OUT OF THE CAR NOW!"
              "GET OUT OF THE CAR NOW!"

| **Layton**: | "SHOW ME YOUR HANDS! DO IT NOW!" |
| | "PUT YOUR HANDS UP!" |
| | "PUT YOUR HANDS UP!" |
| | "LET ME SEE YOUR HANDS!" |
| | |
| **Bone**: | "PUT YOUR HANDS UP!" |
| | |
| **Hill**: | "My door doesn't open!" |
| | |
| **Bone**: | "PUT YOUR HANDS UP!" |
| | |
| **Hill**: | "My door doesn't open!" |

(4:50–5:02)

Hill tried to comply with these rapid-fire—and, at times, contradictory—instructions.  He first attempted to "get out of the car," as Bone had ordered.  (*Id.*)  But as he explained to the Troopers, his door wouldn't open from the inside.  (5:01–5:03)  The dashcam video shows Hill reaching for the *outside* door handle in an effort to "get out of the car," only to be shouted down by the Troopers.  (5:08).  Hill also "put his hands up" in front of his face when he was told to.  (5:01)

Nonetheless, the Troopers continued to approach Hill, guns drawn.  (5:08)  When they were within a few feet, Layton changed his orders again:

| **Layton**: | "PUT YOUR HANDS OUT THE DOOR! DO IT NOW!" |
| | "PUT YOUR HANDS OUT THE DOOR!" |
| | "HEY! PUT YOUR HANDS OUT THE DOOR!" |

"STOP MOVING!"
"PUT YOUR HANDS OUT THE DOOR!"

And then again:

**Layton**: "PUT YOUR HANDS OUT THE WINDOW!"
"PUT YOUR HANDS OUT THE WINDOW!"

(5:03–5:13)

### C. Troopers shoot and kill Hill.

At that point, Hill appeared to move both of his hands towards the center console. (5:13) Layton said, "Hey, he's reaching, reaching, reaching!" (5:15) Bone yelled, "Stop reaching! He's got a gun!" (5:16) Both Troopers then shouted, "Gun!" and discharged their firearms. (5:17)

The Troopers fired four shots in quick succession. (5:18–5:22) Bullets entered Hill's face, neck, and left hand. JA474-475. The time between the first command and the fatal shooting was less than thirty seconds.

After shooting Hill, the Troopers searched frantically for the weapon he was allegedly holding. (5:38 ("I can't see that gun, Bone. You got it? You got the gun? You see a gun?")) As Hill bled out, the

Troopers spent more than a minute looking for a gun instead of rendering aid. (5:23–6:48)

Eventually, Bone found a handgun laying on the front passenger seat. (6:48) Hill was slumped over, "bleeding everywhere." (6:58) The Troopers holstered their weapons, pulled Hill from the car, and rolled him onto the ground. (7:01–8:00) There was "very clearly no pulse." (7:58)

As the district court rightly acknowledged, whether Hill "actually held [a] gun" or "pointed [a] gun at either of the Troopers" is disputed. JA905. The dashcam footage does not show any weapon. And the autopsy report states that Hill was shot in the left hand and the back of his neck; wounds that are inconsistent with the theory that Hill used his right hand to point a gun at Layton, who was standing to his left. JA474-475.

### D. The district court holds that qualified immunity shields the Troopers.

Following his death, Hill's mother initiated this action as the administrator of his estate. In the main, she asserts that, under the

circumstances detailed above, the Troopers acted unreasonably when they used lethal force against her son.[2]  *See* JA9-28.

After discovery, the Troopers moved for summary judgment.  The district court held a hearing on their motion and, thereafter, awarded them summary judgment based on qualified immunity.  JA819-919.

The court explained that, in its view, "the Troopers' actions were objectively reasonable"—and therefore constitutionally permissible— "because other officers, armed with the same information the Troopers had, would have perceived Hill as a threat to the officer's safety." JA903.  And "even if the Troopers used excessive force," the court further reasoned, "they would still be entitled to qualified immunity because they did not violate a clearly established constitutional right." JA911-912.

Benton timely appealed.  JA920.

---

[2] In her amended complaint, Benton brings five claims against the Troopers: a § 1983 claim for excessive force in violation of the Fourth Amendment; and state-law claims of gross negligence, assault and battery, survivorship, and wrongful death.  JA17-18, JA23-26.

## SUMMARY OF THE ARGUMENT

The district court erred by granting summary judgment on the basis of qualified immunity.

First, Hill's killing violated the Fourth Amendment. Viewing the facts in the light most favorable to Benton, a reasonable jury could find that each of the *Graham* factors tilts against the Troopers:

The most "severe" crime Hill possibly committed was eluding arrest—a nonviolent crime.

Hill did not pose an immediate threat to the Troopers. As the district court recognized, whether Hill held a gun or pointed it at the Troopers is in dispute. Instead, he attempted to follow their myriad commands—first to "get out of the car," and then to "put your hands up"—while stuck in his car. This Court's "furtive-moment" cases do not require a contrary result.

Nor was Hill attempting to flee or resist arrest when the Troopers shot him. He stopped attempting to move his car after the Troopers exited their vehicle. And any "hesitation" he exhibited as the Troopers yelled commands cannot reasonably be understood as "recalcitrance." *See Franklin v. City of Charlotte*, 64 F.4th 519, 533 (4th Cir. 2023).

Second, the Troopers are not entitled to qualified immunity. By January 2021, it was clearly established in this Circuit that officers may only use deadly force when they reasonably perceive a threat. And under this Court's precedents, the mere fact that a suspect has access to a firearm, or follows commands imperfectly, cannot justify lethal force.

Finally, and for the same reasons, Benton's state-law claims should proceed to trial.

## ARGUMENT

### Standard of Review

This Court reviews rulings on summary judgment and qualified immunity *de novo*. *Franklin*, 64 F.4th at 529-30.

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)). So, in conducting its review, this Court must view "the facts and all reasonable inferences drawn therefrom . . . in the light most favorable to [Benton]." *See Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

Moreover, this Court "may not credit [the Troopers' contrary] evidence," even if "a jury could well believe th[at] evidence." *See Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 579 (4th Cir. 2017). For example, this Court cannot accept as true the Troopers' statements that Hill pointed a gun at them. *Franklin*, 64 F.4th at 530.

Finally, "[t]o the extent [undisputed] video depicts material facts," this Court "review[s] those facts as they are depicted in the video." *Hupp v. Cook*, 931 F.3d 307, 315, n.3 (4th Cir. 2019).

## Discussion of Law

Qualified immunity does not shield officers who violate clearly established constitutional rights. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

The district court concluded that the Troopers (a) did not violate the Fourth Amendment when they shot and killed Hill; and (b) that, even assuming their force was "excessive," Hill's right to be free from such force was not "clearly established." JA911-917. As explained below, however, the district court got both "prongs" of the qualified immunity analysis wrong.

## I.  Hill's killing violated the Fourth Amendment.

First, the Troopers violated the Fourth Amendment when they shot Hill.  A reasonable jury could find that the *Graham* factors—including whether Hill posed an immediate threat—collectively cut against the Troopers.  And on the record at hand, this Court's "furtive-movement" cases do not require otherwise.

All excessive-force claims are analyzed under the Fourth Amendment's "reasonableness" standard.  *Vathekan v. Prince George's Cnty.*, 154 F.3d 173, 178 (4th Cir. 1998).  That includes claims, like this one, that concern the use of deadly force.  *Id.*

Whether it was "objectively reasonable" to use lethal force against Hill depends on the "totality of the circumstances" and "the information available to the [Troopers]" just before they fired.  *Hensley*, 876 F.3d at 581 (cleaned up).  This "reasonableness" analysis is guided by the three factors articulated in *Graham v. Connor*: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting

arrest or attempting to evade arrest by flight." 490 U.S. 386, 396 (1989).[3]

Viewing the facts in the light most favorable to Benton—as the Court must at this stage—the *Graham* analysis tips against the Troopers.

### The severity of the crime at issue.

When Hill first passed the Troopers, he was driving recklessly; a misdemeanor in Virginia. *See* Va. Code §§ 46.2-852, -862, -868(A). No one contests that Hill was careless, or that the Troopers had reason to apprehend him.

Still, the Troopers opted to follow Hill for more than a minute without running their lights or sirens. (2:34–3:36) In that time, Hill occasionally swerved, but did not come near any other vehicles. (*Id.*) When the Troopers finally turned on their lights, Hill was clearly startled. (3:45) He accelerated away from them before ultimately slowing, attempting a U-turn, and lodging his car in the median. (3:38–4:40)

---

[3] This Court has also said that "the extent of the plaintiff's injury is . . . a relevant consideration." *Jones v. Buchanan*, 325 F.3d 520, 527 (2003). Hill died.

Based on this conduct, the district court concluded that the Troopers "had probable cause that Hill was committing felony eluding arrest," which it considered more "severe" than reckless driving.[4] JA903-904 (quoting Va. Code § 46.5-817(B)).

But as this Court has cautioned, the first *Graham* factor is "intended as a proxy for determining whether [the Troopers] had any reason to believe that [Hill] was a potentially dangerous individual." *Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 895 (4th Cir. 2016) (quoting *Smith v. Ray*, 781 F.3d 95, 102 (4th Cir. 2015)). Unlike when an officer "confronts a suspect engaged in [a violent] offense like robbery or assault," driving offenses do not present the same "risk of danger to the arresting officer." *Smith*, 781 F.3d at 102 (quoting *Parker v. Gerrish*, 547 F.3d 1, 9 (1st Cir. 2008)). In other words, reckless driving and eluding arrest may be "serious" offenses, but they are not particularly "severe" under the *Graham* analysis. *Id.*

In any event, Hill's ability to elude arrest ended when his car got stuck. As such, "the intensity of the situation emanated" not from any

_____

[4] Hill arguably committed *misdemeanor* eluding instead. *See* Va. Code § 46.5-817(A).

criminal conduct by Hill, but "from the volume and vigor of the [Troopers'] commands" and their decision to immediately confront Hill with their guns drawn. *Franklin*, 64 F.4th at 532.

**Whether Hill posed an immediate threat.**

The second *Graham* factor—"whether the circumstances presented an immediate threat"—is especially important when officers shoot to kill. *Franklin*, 64 F.4th at 531. As explained below, the Troopers did not have reason to believe that Hill posed an immediate threat to their safety when they shot him.

While the Fourth Amendment permits the use of deadly force against a suspect who "poses a threat of serious physical harm," officers do not enjoy "the unfettered authority to shoot a member of the public simply because that person is carrying a weapon." *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013). Instead, "deadly force may only be used when, based on a reasonable assessment, the officer . . . is *threatened* with the weapon." *Id.*

When the Troopers made the decision to fire on Hill, he was trapped in his immobilized vehicle, halfway down a highway embankment. Bone commanded him three times to "get out of the

car"—he tried, but couldn't. (5:01 ("My door doesn't open!")) Layton ordered him to "put [his] hands up"—he did. (5:05) And thereafter, the commands continued to change: "Put your hands out the door!" / "Stop moving!" / "Put your hands out the window!" (5:03–5:13)

The district court faulted Hill for not "comply[ing]" fully with these orders. JA907. But that Hill failed to perfectly follow the Troopers' directives is unsurprising. In less than half a minute, the Troopers issued *sixteen* commands; at times simultaneously, and at odds. (4:47–5:13); JA174 (acknowledging differences in commands).

As in *Franklin v. City of Charlotte*, Hill "hesitated" under this verbal barrage. 64 F.4th at 533. "Perhaps he was deciding how to [turn over the] gun [on his passenger seat]—or maybe he was just frightened by the torrent of shouting and gun-pointing." *Id.* But in either case, it would be unreasonable for an officer to view "hesitation" by Hill as threatening "recalcitrance." *Id.*

Of course, the degree to which Hill followed the Troopers' orders would be less relevant if he pointed a gun at them. But as the district court found, whether Hill even *held* a gun is in dispute. JA905. The dashcam footage is unhelpful here—due to the angle, we cannot see

whether Hill is holding a weapon.  (*See* 5:11–5:22)  And the gun that *was* found (after a minute of searching) was resting on the front passenger seat.  JA364.  Finally, even assuming Hill held a gun, the autopsy contradicts the Troopers' assertion that Hill pointed it at them.  As noted above, Hill was shot in the left hand and the back of his neck.  JA474-475.  Because Layton was standing to Hill's left, the placement of these wounds suggests that Hill did not point a gun at Layton with his right hand, as the Troopers have claimed.

To be sure, the Troopers have testified otherwise.  *See, e.g.*, JA188, 311.  But at the summary-judgment stage, this Court cannot credit that contradictory evidence, even though "a jury could well believe [it]."[5] *Hensley*, 876 F.3d at 579; *Franklin*, 64 F.4th at 530.

That a handgun was found in the car makes no difference:  This Court has held time and again that mere possession of a firearm does not justify the use of deadly force—even when the gun is held by the

---

[5] There may also be reason to doubt the credibility of Trooper Layton's deposition testimony.  In 2020, as a then-officer with the Richmond Police Department, Layton was formally investigated after he pepper-sprayed a woman in the face.  *See* JA683-685.  The investigator concluded that Layton had violated the Department's use-of-force protocols.  JA716.  When asked about that incident, however, Layton said that he "did nothing wrong."  JA81.

suspect, and clearly visible to law enforcement. *See, e.g.*, *Hensley*, 86 F.3d at 582; *Cooper*, 735 F.3d at 159. When viewed in the light most favorable to Benton, this is a case where the "gun was real, but the threat was not." *Franklin*, 64 F.4th at 531 (cleaned up).

Nevertheless, the district court found that the Troopers' decision to shoot Hill was "objectively reasonable." JA911. To get there, the court relied heavily on this Court's "furtive-movement" decisions— namely *Elliot*, *Slattery*, and *Anderson*. *See* JA905-908. However, the facts in each of those cases distinguish them from this one.

In *Elliot v. Leavitt*, officers arrested a suspected drunk driver, handcuffed him, and put him in the front seat of a squad car. 99 F.3d 640, 642 (4th Cir. 1996). Sometime later, the officers "noticed a movement and looked to find [the suspect] with his finger on the trigger of a small handgun pointed at the officers." *Id.* The officers ordered the suspect to drop the gun; when he refused, they shot him. *Id.*

On the "uncontroverted evidence" that the officers faced "an intoxicated individual pointing a gun at them only a few feet away," this Court held that the use of lethal force was objectively reasonable. *Id.*

But there is an obvious difference between *Elliot* and this case: whether Hill ever held a gun (or pointed it at the officers) *is* disputed.

The same goes for *Slatterly v. Rizzo*, 939 F.2d 213 (4th Cir. 1991) and *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001). In both of those cases, officers fired on suspects after perceiving them to reach (albeit mistakenly) for firearms. Unlike here, however, the officers in both of those cases had good reason to think their suspects would be armed.

In *Slatterly*, officers conducted a sting on an "open-air drug market." 939 F.2d at 214. There had been "past incidents involving weapons" at that location—including a recent drive-by shooting. *Id.* An officer approached Slatterly, who was sitting in his vehicle, and ordered him to raise his hands. *Id.* at 215. When Slatterly didn't respond, the officer opened the door of the car and again ordered him to put up his hands. *Id.* Slatterly "turned his head slowly towards the officer," then did the same with "his entire upper body." *Id.* As he did this, Slatterly's hand was "partially closed around an object" (later determined to be a beer bottle). *Id.* The officer shot him in the face. *Id.*

This Court held that the shooting was reasonable because, in those circumstances, an officer would "have had probable cause to

believe that [Slatterly] posed a deadly threat." *Id.* at 216-17. As noted, the sting took place in an area rife with violence (including gun violence). And it was "undisputed" that, before he was shot, Slatterly menacingly turned towards the officer with a gun-sized object in his hand. *Id.*

A decade later, this Court confronted a similar fact pattern in *Anderson*. There, a mall patron approached a police officer and told him that Anderson "appeared to have a gun under his sweater." 247 F.3d at 128. With this knowledge, the officer confronted Anderson and ordered him to "raise his hands and get down on his knees." *Id.* Anderson initially complied, but then, without explanation, lowered his hands "in an attempt to reach into his back pocket." *Id.* Thinking Anderson "was reaching for the reported weapon," the officer shot him. *Id.* And as in *Slatterly*, this Court concluded that the officer's use of deadly force "was reasonable in light of [his] well-founded, though mistaken, belief that Anderson was reaching for a handgun." *Id.* at 132.

The upshot of these cases is that "furtive movements toward a perceived firearm"—and contrary to *clear* commands—"would rightfully cause a reasonable officer to fear that the suspect intended to cause

imminent deadly harm." *See Knibbs v. Momphard*, 30 F.4th 200, 220 (4th Cir. 2022) (discussing *Slatterly* and *Anderson*). Unlike in those cases, however, the Troopers here had no prior indication that Hill might be armed. As a result, they had far less reason to "perceive" his leaning towards the center console as "furtive movement toward a . . . firearm." *Id.* And the Troopers' commands were far less clear than those in *Slatterly* (unwavering instruction to raise hands) and *Anderson* (same). In short, the "furtive-movement" cases are distinguishable and should not dictate the result here.

### Whether Hill was attempting to flee.

The final consideration is whether Hill was attempting to flee in the moments before he was shot. *Graham*, 490 U.S. at 396.

Hill initially tried to evade the Troopers. (*See* 3:38–4:40) But by the time the Troopers exited their cruiser, "he stopped." JA658. With his car immobilized—and two Troopers pointing their guns at him—Hill gave up on any efforts to flee. In fact, he tried to open his car door *towards the Troopers*. (5:08); *see Smith*, 781 F.3d at 101, 103 (unreasonable to perceive suspect as fleeing when, "at the moment the challenged force was employed," she stood in place and "remained facing the officer").

According to the district court, Hill was "actively resisting the Troopers' commands as they approached the vehicle," even if he wasn't attempting to flee. JA911. An equally plausible view, however, is that Hill was scared, confused, and doing his best to comply with the Troopers' orders. JA658 ("He put his hands up and he put them out the window, they were obviously shaking . . . .").

* * *

Viewing the facts in Benton's favor, a reasonable jury could conclude that Hill's killing was unlawful. The *Graham* factors tip against the Troopers—Hill's crimes were not especially "severe"; the Troopers could not have reasonably perceived an immediate threat; and, at the moment he was shot, his efforts to flee had ceased. Under those circumstances, the Troopers violated the Fourth Amendment.

## II. The Troopers are not entitled to qualified immunity.

The district court also granted qualified immunity on the "clearly established" prong. JA917. But as of January 9, 2021, the Troopers were on notice that killing Hill would violate the Fourth Amendment.

As this Court well knows, "clearly established law" is not to be defined "at too high a level of generality." *City of Tahlequah v. Bond*,

___U.S.___, 142 S. Ct. 9, 11 (2021). That said, "[i]n some cases, [officers] can be expected to know that if X is illegal, then Y is also illegal, despite factual differences between the two." *Williams v. Strickland*, 917 F.3d 763, 770 (4th Cir. 2019). What matters is that it is "clear to a reasonable officer that his conduct [would be] unlawful in the situation he confronted." *City of Tahlequah*, 142 S. Ct. at 11.

When the Troopers shot Hill, it was clearly established in this Circuit that:

- "[D]eadly force may only be used . . . when, based on a reasonable assessment, the officer or another person is *threatened*"—even if the suspect is carrying a gun. *Cooper*, 735 F.3d at 159; *see also Hensley*, 876 F.3d at 582.

- A suspect's imperfect cooperation "has never given officers carte blanche to use deadly force." *Estate of Jones v. City of Martinsburg*, 961 F.3d 661, 670-71 (4th Cir. 2020).

- An officer may not take "an unreasonably aggressive tack that quickly escalate[s]" a nonviolent scenario into to a violent exchange. *Smith*, 781 F.3d at 95.

- And, of course, excessive force may not be used against a person not suspected of committing a violent crime; who poses no immediate threat; and who is not attempting to flee. *Graham*, 490 at 396.

In the moments before they shot him, the Troopers confronted a scared teenager, whose car was stuck in a ditch. They quickly moved on his immobilized vehicle with their guns drawn. Hill attempted to comply with their commands—first to exit his car, then to hold his hands up—though he failed to do so perfectly. And although a gun was found in his vehicle, whether he held or pointed it at the officers is in dispute.

On those facts, any reasonable officer would have understood that shooting Hill would be unlawful—even if this Court (or the Supreme Court) had not weighed in on a "fact pattern precisely identical to the instant one." *Knibbs*, 30 F4th at 223 (quoting *White v. Pauly*, 58 U.S. 73, 77 (2017)). Indeed, "*Cooper, Hensley, Slattery, Anderson*, [and] *Elliot* together clearly establish that the failure to obey commands . . . only justifies the use of deadly force if [a] person makes some sort of

furtive or other threatening movement *with the weapon*." *Id.* at 225 (emphasis added). Jurors may ultimately agree with the Troopers' version of events. But they might also find that it was unreasonable to shoot a confused, non-threatening Hill, despite his failure to perfectly follow the Troopers' commands.

## III. The district court wrongly dismissed the state-law claims.

In addition to her Fourth Amendment claim, Benton also brings several claims under Virginia law: gross negligence, assault and battery, survivorship, and wrongful death. JA23-26.

The district court's sole reason for dismissing these claims was that, because they all "arise from the [Troopers'] use of force," they must "fail or proceed with the success of [the] federal excessive force claim." JA918 (citing *Thompson v. Virginia*, 878 F.3d 89, 111 (4th Cir 2017) and *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994)). Thus, if this Court agrees that the Troopers are not entitled to qualified immunity at this stage, then Benton's state-law claims should proceed to trial, too.

## CONCLUSION

Benton respectfully requests that this Court reverse the grant of summary judgment and remand for trial on all claims.

## STATEMENT REGARDING ORAL ARGUMENT

Benton respectfully requests oral argument.

**/s/ Zachary Ezor**
Zachary Ezor
TIN FULTON WALKER & OWEN, PLLC
115 East Main Street
Durham, NC 27701
(404) 791-8243

*Counsel for Appellant*

# CERTIFICATE OF COMPLIANCE

1.  This document complies with type-volume limits because,
    excluding the parts of the document exempted by Fed. R. App. P.
    32(f) (cover page, disclosure statement, table of contents, table of
    citations, statement regarding oral argument, signature block,
    certificates of counsel, addendum, attachments):

    this document contains <u>4,657</u> words.

2.  This document complies with the typeface requirements because:

    This document has been prepared in a proportional spaced
    typeface using <u>Microsoft Word</u> in <u>14-point Century
    Schoolbook</u>.

**<u>/s/ Zachary Ezor</u>**
Zachary Ezor
TIN FULTON WALKER & OWEN, PLLC
115 East Main Street
Durham, NC 27701
(404) 791-8243

*Counsel for Appellant*