No. 23-1680

# In the United States Court of Appeals for the Fourth Circuit

LATOYA K. BENTON, as administrator of the estate of Xzavier D. Hill, deceased,

*Plaintiff-Appellant*

v.

SETH W. LAYTON and BENJAMIN I. BONE,
individually and in their official capacities as State Troopers for the Virginia State Police,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Virginia
at Richmond

### REPLY BRIEF OF APPELLANT

Zachary Ezor
TIN FULTON WALKER & OWEN
119 Orange St.
Durham, NC 27701
(919) 307-8400
zezor@tinfulton.com
*Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ..................................................................................................... 1

ARGUMENT .............................................................................................................. 3

    I.    The Troopers' use of lethal force was unreasonable .............. 3

        A.    Hill did not pose an immediate threat ......................... 3

        B.    The remaining *Graham* factors tilt against the Troopers ....................................................................... 7

    II.    The Troopers are not entitled to qualified immunity ............ 8

    III.    Benton's state-law claims should proceed ............................ 13

CONCLUSION ........................................................................................................ 13

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Russell*,
    247 F.3d 125 (4th Cir. 2001) ...................................................................... 5, 6

*City of Tahlequah v. Bond*,
    595 U.S. 9, 12 (2021) ................................................................................ 8, 12

*Cooper v. Sheehan*,
    735 F.3d 153 (4th Cir. 2013) ................................................................ 2, 9, 12

*Estate of Jones v. City of Martinsburg*,
    961 F.3d 661 (4th Cir. 2020) ..................................................................... 11, 12

*Franklin v. City of Charlotte*,
    64 F.4th 519 (4th Cir. 2023) ................................................................. 3, 5, 13

*Henry v. Purnell*
    652 F.3d 524 (4th Cir. 2011) (en banc) ............................................................ 1

*Hensley ex rel. North Carolina v. Price*,
    876 F.3d 573 (4th Cir. 2017) ............................................................... 9, 10, 11

*Knibbs v. Momphard*,
    30 F.4th 200 (4th Cir. 2022) ........................................................................... 6

*Slattery v. Rizzo*,
    939 F.2d 213 (4th Cir. 1991) ...................................................................... 5, 6

*Smith v. Ray*,
    781 F.3d 95 (4th Cir. 2015) ............................................................................ 7

# INTRODUCTION

At summary judgment, the facts must be taken in the light most favorable to the non-moving party. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

So viewed, the facts show that Troopers Layton and Bone shot and killed Xzavier Hill as he sat in his vehicle, stuck in a ditch. Although Hill had been speeding, his car was lodged in the median and immobilized. The Troopers advanced swiftly on Hill with their guns drawn and issued a confusing bevvy of commands—sixteen in total.

In half a minute, the Troopers yelled for Hill to (1) "get out of the car," (2) "put your hands up," (3) "put your hands out the door," (4) "stop moving," and, finally, (5) "put your hands out the window." (Dashcam at 4:47–5:13) The video footage shows Hill striving to comply—at times raising his "hands up" and "out the door" as ordered—while telling the Troopers that his "door doesn't open." (Dashcam at 4:50–5:02).

A jury could conclude that, under these circumstances, the Troopers did not reasonably perceived Hill to pose a serious threat to themselves or others. As such, their use of lethal force violated the Fourth Amendment. And because the unlawfulness of the Troopers'

1

conduct was clearly established at the time, they are not shielded by qualified immunity.

The Troopers say that they fired on Hill because he pointed a gun at them. But as the district court rightly noted, whether Hill ever held a gun—much less pointed it at the Troopers—is "in dispute." JA905. Contrary to their testimony, the video does not depict Hill holding a weapon. And Hill's autopsy report further undermines the Troopers' rendition that he pointed a gun at them using his right hand, as he sustained a bullet wound to his *left* hand.

The Troopers also contend that lethal force was warranted because, even if Hill wasn't actually pointing a gun at them, he was "actively disobeying their commands and reaching for what they *perceived* was a handgun." Resp. Br. 21–22. But this Court has made clear that an officer's threat "assessment" must be "reasonable" under the circumstances. *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013). Unlike in *Slattery* and *Anderson*, on which the Troopers rely, there was little reason to perceive that Hill was armed, or that he was actively defying their confusing and conflicting commands.

2

Ultimately, the district court erred in granting summary judgment to the Troopers. This Court should reverse.

## ARGUMENT

**I.    The Troopers' use of lethal force was unreasonable.**

As explained in the Opening Brief, the Troopers violated the Fourth Amendment when they shot and killed Hill. Opening Br. 13–23.

### A.    Hill did not pose an immediate threat.

The parties agree that one *Graham* factor— "whether the suspect poses an immediate threat to the safety of the officers"—is "particularly important" in deadly force cases like this one. *See Franklin v. City of Charlotte*, 64 F.4th 519, 531 (4th Cir. 2023); Resp. Br. 19. But they disagree about whether Hill posed a threat to the Troopers here.

As the district court rightly acknowledged, whether Hill "actually held [a] gun" or "pointed [a] gun at either of the Troopers" is in dispute. JA905. That factual dispute is real, and "precludes a definitive finding at this stage" that Hill posed an actual threat. *Id.*

First, the Troopers concede that "whether Hill was pointing a gun is not visible from the video." Resp. Br. 33. This absence is conspicuous. Throughout the encounter, the video clearly captures

3

Hill's hands, face, and movement. (Dashcam at 4:40–5:20) The scene is well lit (both by the Troopers' headlights and flashlights), and the camera vantage is steady and unobstructed. Yet there is no weapon. *Compare* (Dashcam at 5:16), *with* JA58 ("He was holding the handgun in his right hand approximately 5 inches away from his face.").

Second, the Troopers' assertion that Hill pointed a gun at Layton with his *right hand* is called into doubt by the autopsy report. The report states that Hill was shot in the left side of his face, the back of his neck, and his left hand. JA474–475. Even assuming two of these wounds are "consistent with Hill having pointed a gun at Trooper Layton," *see* Resp. Br. 33, the other isn't. Had Hill raised a gun toward Layton with his right hand, that hand would have been exposed to the Troopers' gunfire, *not* the hand that remained in the vehicle. And relatedly, that Hill was shot in his *left* hand is consistent with his attempts to use that hand to open his car door, in line with the Troopers' commands. (*See* Dashcam at 5:07, 5:16)

In short, a reasonable jury could find that both (a) the absence of a gun in the video and (b) the locations of Hill's wounds contradict the

4

Troopers' testimony that Hill held a gun with his right hand "directly in front of his face." *See, e.g.*, JA57–58, JA189–190.

The parties also disagree about the degree to which Hill followed the Troopers' commands. According to the Troopers, Hill "disobeyed repeated commands to show his hands," thereby giving them "probable cause to believe that [he posed] an imminent threat." Resp. Br. 44. But as previously explained, the video depicts Hill trying (albeit imperfectly) to comply with the Troopers' myriad orders—first to "get out of the car," then to "put [his] hands up," then to "put [his] hands out the door," then to "stop moving," then to "put [his] hands out the window." Opening Br. 16–17; (Dashcam at 4:47–5:13). It would be unreasonable to treat Hill's failure to perfectly execute sixteen, rapid-fire commands as a threatening "lack of cooperation." *See* Resp. Br. 43–44; *Franklin v. City of Charlotte*, 64 F.4th 519, 533 (4th Cir. 2023).

Nevertheless, the Troopers assert that they were still right to shoot Hill because—whatever the actual threat level—they "perceived" him to be threatening. Resp. Br. 35; *see* JA905. But their reliance on cases like *Anderson* and *Slattery* for this argument is misplaced. Resp. Br. 44–46. To be sure, those cases hold that a suspect's "furtive

5

movements toward a perceived firearm" can support a reasonable fear of imminent harm. *Knibbs v. Momphard*, 30 F.4th 200, 220 (4th Cir. 2022) (collecting cases). But the facts here are distinguishable. Opening Br. 21–22. The officers in *Slattery* and *Anderson* had good reason to believe their suspects were armed; as such, the "furtive movements" there were reasonably understood as threatening actions. *See* 247 F.3d 125, 128 (4th Cir. 2001) (belief that suspect was reaching for a handgun was "well-founded" because witness told officer beforehand that he "appeared to have a gun under his sweater"); 939 F.2d 213, 214–17 (4th Cir. 1991) (officer was right to perceive a "deadly threat" in an "open-air drug market" that was the site of a recent drive-by shooting). In contrast, the Troopers had no reason to suspect that Hill might be armed.

Moreover, qualified immunity was awarded in *Anderson* and *Slattery* because the officers there gave clear and appropriate commands to their potentially armed suspects, then shot the suspects when they disobeyed in a threatening way. 247 F.3d at 128 (suspect disregarded straightforward instruction to "raise his hands and get down on his knees"); 939 F.2d at 215 (suspect "failed to respond" to

clear order to "raise his hands"). Here, Hill was attempting to comply with confusing and contradictory commands when he was shot.

### B. The remaining *Graham* factors tilt against the Troopers.

Although less weighty, the remaining *Graham* factors—"the severity of the crime at issue," and whether Hill was "actively resisting . . . or attempting to evade arrest"—likewise favor Benton.

First, Hill's erratic driving (though reckless) did not pose the same "risk of danger to the arresting officer" as a violent offense, like robbery or assault. *Smith v. Ray*, 781 F.3d 95, 102 (4th Cir. 2015) (quoting *Parker v. Gerrish*, 547 F.3d 1, 9 (1st Cir. 2008)). This was especially true once Hill's car became immobilized in the median. Opening Br. 15–16. And the fact that the Troopers followed Hill for more than a minute without running their lights or sirens suggests that his underlying crime was not particularly "severe." (Dashcam at 2:34–3:36)

Second, although Hill initially fled the Troopers, he "stopped" when the Troopers got out of their vehicle. JA658. With his car immobilized, Hill gave up on any attempt to evade arrest. Instead, he did his best to follow the Troopers' commands—putting his hands up and out the window, and attempting to open his drivers-side door so he

7

could exit towards the Troopers. JA658; (Dashcam at 5:08). Because Hill was not attempting to flee "at the moment the challenged force was deployed," this factor, too, weighs against the reasonableness of the Troopers' firing.

In sum—and viewing the evidence in the light most favorable to Benton—a reasonable jury could conclude that the Troopers used excessive force when they killed Hill.

## II. The Troopers are not entitled to qualified immunity.

The unlawfulness of Hill's killing was also clearly established at the time. Opening Br. 23–26.

The Troopers contend that Benton "has not identified a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." Resp. Br. 42 (quoting *City of Escondido v. Emmons*, 586 U.S. ___, 139 S. Ct. 500, 504 (2019) (per curiam)). But as set forth in the Opening Brief, this Court's precedents would have made it "clear to a reasonable officer that his conduct [would be] unlawful in the situation he confronted." *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021).

8

First, *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013), and *Hensley ex rel. North Carolina v. Price*, 876 F.3d 573 (4th Cir. 2017) clearly established that mere possession of a weapon does not justify the use of deadly force. Opening Br. 24.

In *Cooper*, officers responded to a call about an "altercation" at Cooper's mobile home. 735 F.3d at 155. The officers tapped on Cooper's window to alert him of their presence. *Id.* In response, Cooper "retrieved the twenty-gauge shotgun he kept by the door" and stepped out onto his porch. *Id.* Then, "[r]eacting to the site of Cooper and his shotgun, the [o]fficers drew their service weapons and commenced firing without warning." *Id.* at 156.

As here, the officers in *Cooper* argued that cases like *Anderson* and *Slattery* justified their use of deadly force—the sight of the shotgun, they said, caused them to reasonably fear for their safety. *Id.* at 159. But despite the fact that Cooper was visibly armed, this Court held that the officers had acted unlawfully.

Officers are entitled to use deadly force where they have "probable cause to believe that a suspect poses a threat of serious physical harm." *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). But that

9

probable cause must always be grounded in a "*reasonable assessment*" of danger. *Id.* (emphasis added). Although Cooper was holding a shotgun, no reasonable officer would have had probable cause to feel threatened by his actions. *Id.* Accordingly, deadly force was unwarranted. *Id.*

Four years later, the Court in *Hensley* again denied qualified immunity to officers who killed an armed suspect. There, as in *Cooper*, officers responded to a "domestic disturbance." 876 F.3d at 578. When they arrived on the scene, Hensley retrieved his pistol and walked out onto his porch. *Id.* Hensley's family struggled to take the gun from him; he fought them off in front of the officers, even going so far as to strike one of his daughters with the gun. *Id.* Still holding the handgun, Hensley then descended from the porch and made his way toward the officers. *Id.* As he advanced, the officers exited their vehicles and shot him. *Id.*

The officers argued that their use of deadly force was "clearly reasonable" under the circumstances—Hensley had "demonstrated a propensity for violence" and "came toward them with a gun." *Id.* at 582. Nevertheless, this Court found that the use of force was unreasonable under the circumstances. *Id.* Hensley was holding a gun, had used it to

10

strike someone else, and was approaching the officers when they shot him. Yet he did not "pose[] a threat of serious physical harm" in the moments before he was shot. *Id.* at 583.

Second, it was clearly established at the time of Hill's killing that a suspect's imperfect attempts to follow commands do not "give[] officers carte blanche to use deadly force." *Estate of Jones v. City of Martinsburg*, 961 F.3d 661, 670–71 (4th Cir. 2020).

In *Estate of Jones*, for example, this Court reversed a grant of qualified immunity where officers fatally shot a man wielding a knife. *Id.* at 671. There, the officers characterized Jones as "a fleeing, armed suspect, who was not cooperating with law enforcement." *Id.* at 670. And Jones's estate admitted that he (a) was carrying a knife, (b) failed to comply with officers' commands, and (c) had *actually stabbed* an officer in the leadup to his killing. *Id.* at 666–67.

Viewed in the appropriate light, however, the facts also suggested that Jones was secured and incapacitated in the final moments before his death. *Id.* at 664. Thus, despite his being armed—and his lack of cooperation—it was "not clear that Jones continued to pose an

11

immediate threat of physical harm to the officers at the time they shot and killed him." *Id.* at 666.

Likewise here, the Troopers could not have made a "reasonable assessment" that Hill posed a serious threat to their safety. *Cooper*, 735 F.3d at 159. Viewing the facts in the light most favorable to Benton, the Troopers approached Hill, guns drawn, as he was immobilized in his vehicle, struggling to follow their commands. Whether he pointed a gun at them is disputed. JA905; *see Hensley*, 876 F.3d at 582 (holding that a jury "could conclude that the [officers] shot Hensley only because he was holding a gun, although he never raised the gun to threaten them"). And his imperfect attempts to follow their orders cannot justify their use of lethal force. *Estate of Jones*, 961 F.3d at 670–71.

In short, this is not an instance in which "a reasonable officer could miss the connection between [prior] case[s] and this one." *City of Tahlequah*, 595 U.S. at 14. Because it was clearly established that shooting and killing Hill under the circumstances would violate the Fourth Amendment, the Troopers are not entitled to qualified immunity.

12

**III. Benton's state-law claims should proceed.**

Because the Troopers acted unreasonably when they shot and killed Hill, Benton's state-law claims for gross negligence, assault and battery, survivorship, and wrongful death should move forward.

Virginia and federal law are "coextensive on the issue of reasonableness in this context." *Cf. Franklin*, 64 F.4th at 537. And because Benton's state-law claims all "arise from the [Troopers'] use of force" they must "fail or proceed with the success of the federal excessive force claim." JA918. The parties and the district court agree on this point. *See id.*; Opening Br. 26; Resp. Br. 47–48.

## CONCLUSION

Benton respectfully requests that this Court reverse the grant of summary judgment and remand for trial on all claims.

Respectfully submitted,

**/s/ Zachary Ezor**
Zachary Ezor
TIN FULTON WALKER & OWEN
zezor@tinfulton.com
*Counsel for Appellant*

December 6, 2023

13

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 2,553 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (6) because it has been prepared in a 14-point, proportionally spaced typeface.

/s/ **Zachary Ezor**
Zachary Ezor
*Counsel for Appellant*